**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**STEVE ANTHONY TUCKER,**

        **Plaintiff,**

**v.**                                  **Case No.: 3:11-cv-00930**

**MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,**

        **Defendant.**

## MEMORANDUM OPINION

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying plaintiff's application for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is presently before the Court on the parties' cross motions for judgment on the pleadings. (ECF Nos. 12 and 13). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 8 and 11). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I.    Procedural History

Plaintiff, Steve Anthony Tucker (hereinafter referred to as "Claimant"), filed for DIB and SSI benefits in March and April 2008, alleging disability beginning on

February 23, 2008 due to a heart attack; severe blockage of circulation in neck; stroke; hypertension; irregular heart beat; gout; loss of strength in hands; decreased vision; and staphylococcus infection in the left index finger. (Tr. at 144, 152, 201). On July 9, 2008, the applications were denied, and Claimant did not appeal the determination. (Tr. at 11, 72, 73). On August 24, 2009, Claimant filed a second set of applications for SSI and DIB, which again alleged a disability onset date of February 23, 2008. (Tr. at 157, 165). These applications were denied initially and upon reconsideration. (Tr. at 11). Claimant then filed a written request for a hearing before an Administrative Law Judge ("ALJ"). The administrative hearing was held on August 26, 2010 before the Honorable Harry C. Taylor, II, ALJ. (Tr. at 31–71). By decision dated November 1, 2010, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 11–30).

The ALJ's decision became the final decision of the Commissioner on October 24, 2011 when the Appeals Council denied Claimant's request for review. (Tr. at 1–3). On November 21, 2011, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed his Answer and a Transcript of the Proceedings on January 23, 2012. (ECF Nos. 9 and 10). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 12, 13, and 14). Accordingly, this matter is ready for resolution.

## II.   **Claimant's Background**

Claimant was 43 years old at the time of his alleged disability onset. (Tr. at 144). He was able to communicate in English and completed high school. (Tr. at 200, 210). Claimant also received specialized training in a chef apprenticeship program and in food safety handling. (Tr. at 202). His prior relevant employment included work as a cook

and on an assembly line at an automobile manufacturing plant. (Tr. at 212).

III.  **Summary of ALJ's Findings**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. See *Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. (the "Listings). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the

performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. §§ 404.1520a, 416.920a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the

claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3)

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status requirement of the Social Security Act through December 31, 2014. (Tr. at 13, Finding No. 1). The ALJ then determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since February 23, 2008. (*Id.*, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments including: status post myocardial infarction; chronic obstructive pulmonary disease; ischemic cerebrovascular accident; liver problems including hepatitis and anemia; gout; disc bulge of the lumbar spine; and hypertension. (Tr. at 14-19, Finding No. 3). The ALJ considered Claimant's complaints of mild degenerative deterioration of the hip; hyperlipidemia; dizziness; venous insufficiency of the lower extremities; gallbladder disease; transient hyponatremia, hypokalemia, urinary tract infection; type II diabetes; gastrointestinal problems; osteomylitis; alcohol abuse; decreased vision; and depressive and cognitive disorder, but found these medical impairments to be non-severe. (*Id.*).

At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any impairment contained in the Listing. (Tr. at 19-21, Finding No. 4). The ALJ found that Claimant had the following RFC:

> [C]laimant has the residual functional capacity to perform light work ... This individual should avoid concentrated exposure or extreme cold; extreme heat; humidity; vibrations; fumes such as odors, dusts, gases, and poorly ventilated spaces; and hazards such as moving machinery and unprotected heights. He should not operate a motor vehicle. This individual has decreased grip and coordination of the left upper dominant extremity. He has less than 100 percent use of two fingers of the left hand. Also, this individual has chest pain, which is largely based upon exertion. He can occasionally engage in bending, stooping, kneeling, crouching, and crawling. He should never climb ladders, ropes, or scaffolds.

(Tr. at 21-28, Finding No. 5).

As a result, Claimant could not return to any past relevant employment. (Tr. at 28, Finding No. 6). The ALJ noted that Claimant was 43 years old at the time of the alleged disability onset, which qualified him as a "younger individual age 18-49." (*Id.*, Finding No. 7). He had a high school education and could communicate in English. (*Id.*, Finding No. 8). The ALJ found that transferability of job skills was not an issue, because the Medical-Vocational Rules supported a finding of "not disabled" regardless of transferability of skills. (*Id.*, Finding No. 9). The ALJ considered these factors and the RFC finding and, relying upon the testimony of a vocational expert, determined that Claimant could perform jobs at the light exertional level; such as, routine office clerk; mail room clerk, non-postal; and fast food worker, and at the sedentary level; such as, food checker; telephone solicitor; and unskilled information clerk. (Tr. at 28–29, Finding No. 10). On this basis, the ALJ concluded that Claimant was not under a disability as defined by the Social Security Act. (Tr. at 29, Finding No. 11).

## IV.   **Claimant's Challenges to the Commissioner's Decision**

Claimant raises two challenges to the Commissioner's decision. First, he argues that the ALJ failed to properly weigh an August 2010 functional assessment prepared by Claimant's treating physician, Dr. Donald Klinestiver. (ECF No. 12 at 10-13). Dr.

Klinestiver found Claimant to be severely limited in his physical ability to perform daily work activities; an opinion which the ALJ largely rejected on the basis that it was not supported by the objective evidence and was made without full review and access to all of the evidence of record. Claimant asserts that these reasons for disregarding the opinion are vague, conclusory, and contrary to the Social Security regulations.

Second, Claimant contends that the ALJ failed to adequately analyze and address the combined impact of Claimant's impairments on his ability to engage in work-related activities. (*Id.* at 13-19). According to Claimant, the ALJ did not fully evaluate his impairments when addressing the Listing and ignored their synergistic effect when determining his RFC. Moreover, Claimant argues that the ALJ failed to provide any explanation in the written decision that would allow a subsequent reviewer to reasonably conclude that the ALJ had considered the impairments in combination.

## V.    <u>Scope of Review</u>

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is based upon a correct application of the law and is supported by substantial evidence. In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined substantial evidence as:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). The Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility

determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

The Court has considered both of Claimant's challenges in turn and finds them unpersuasive. To the contrary, having analyzed the record as a whole, the Court finds that the decision of the Commissioner was reached in a manner consistent with the relevant regulations and is supported by substantial evidence.

## VI.  Relevant Evidence

The Court has reviewed the Transcript of Proceedings in its entirety, including all of the medical records in evidence, and summarizes below Claimant's medical treatment and evaluations to the extent that they are relevant to the issues in dispute.

### A.  Records Prepared By Dr. Donald Klinestiver

Given the ALJ's conclusion that Dr. Klinestiver's opinion was not based on a complete understanding of Claimant's medical condition and evaluations, separating the records that were clearly in Dr. Klinestiver's possession from those that were not should assist in resolving Claimant's first challenge. According to the Transcript of Proceedings, Dr. Klinestiver's records are found at as Exhibits 10F, 15F, 20F, and 25F and include the following information.

### 1.    September 1978 through December 2007

Claimant's initial visit with Dr. Klinestiver was on September 21, 1978 when Claimant was fourteen years old. (Tr. at 744) At that visit, Claimant underwent a physical examination, which was noted to be normal. Over the next eleven years, Claimant returned to Dr. Klinestiver's office eleven times for routine physicals and treatment of minor ailments such as chest congestion, flu-like symptoms, and headaches. (*Id.*)

On August 20, 1991, Claimant, now twenty-seven years old, presented to Dr. Klinestiver's office complaining of pain in his back and right leg, which was accompanied by muscle spasms. (*Id.*). A screening EKG was performed and revealed ventricular premature complexes. Dr. Klinestiver instructed Claimant to avoid caffeine and alcohol and prescribed Anaprox, a non-steroidal anti-inflammatory medication. At a follow-up visit three days later, Claimant continued to have pain, so Dr. Klinestiver applied ultrasound and prescribed Darvocet-N 100.[1] When the pain persisted at a visit on September 3, 1991, Dr. Klinestiver prescribed Decadron, a corticosteroid. (*Id.*). Claimant returned at least four more times for this episode of back pain. (Tr. at 744, 746). In February 1992, Dr. Klinestiver received a letter from Dr. Szendi-Horvath, an orthopedic surgeon, who advised that he had examined Claimant. According to Dr. Szendi-Horvath, Claimant's physical examination was normal, and he had no neuralgic symptoms. Claimant was given medication and told to return as needed. (Tr. at 747).

On October 3, 1994, Claimant returned to Dr. Klinestiver's office complaining of re-injuring his back. (Tr. at 746). He described having pain in his left leg. Dr. Klinestiver

---

[1] Darvocet-N 100, a combination of propoxyphene and acetaminophen, was banned by the Federal Drug Administration in 2010 when it became clear that the drug could trigger abnormal and even fatal heart rhythms. *See WebMD News Archives.* © 2010 WebMD, LLC.

told Claimant to remain off work for one week and to return for a follow-up visit the following Monday. The next office note pertaining to Claimant's back, however, was written by Dr. Klinestiver fifteen months later. (Tr. at 748). On January 10, 1996, Dr. Klinestiver documented that Claimant had changed a car tire and now had lower back pain. Dr. Klinestiver diagnosed an acute lumbosacral sprain and prescribed several medications. Claimant was instructed to return in one week. (*Id.*).

Claimant did not return until January 1998, and on that visit, he complained of bronchitis and laryngitis. (*Id.*). On April 15, 1998, Claimant presented to Dr. Klinestiver's office with another acute lumbosacral strain and was given medications. Dr. Klinestiver completed a Medical History Record that day and indicated that Claimant had never had an operation; took only aspirin on a routine basis; had never been hospitalized for a disease; had never had a serious accident or illness; and had no chronic physical symptoms. (Tr. at 749-50).

On May 19, 1998, Claimant presented to Dr. Klinestiver and reported that he had pulled his back again when lifting an air conditioner. (Tr. at 748). Claimant had additional complaints of back pain with sciatica on February 15, 1999, prompting Dr. Klinestiver to recommend imaging by MRI and a consultation with a neurologist. (Tr. at 756). A routine lumbar MRI was performed on March 2, 1999, which revealed a disc narrowing at the L2/3 with a small disc herniation; disc narrowing at L3/4 accompanied by a large posterior left paracentral disc herniation with disc material impressing on the thecal sac and adjacent nerve root; mild disc narrowing at the L4/5; and disc narrowing at the L5/S1 with some broad based disc bulging. (Tr. at 751).

Claimant saw Dr. Panos Ignatiadis, a neurosurgeon, on March 24, 1999. (Tr. at 754). On that same date, Dr. Ignatiadis wrote a letter to Dr. Klinestiver reporting the

results of Claimant's examination. Dr. Ignatiadis indicated that Claimant had a ten-year history of back and left leg pain that flared-up approximately two times per year. Recently, his pain had worsened and caused him to fall down. He began to favor his left leg, causing him to place his weight on his right leg and ultimately breaking the fifth metatarsal of his right foot. Dr. Ignatiadis described the pain as "classical in the L/4 distribution" and noted that it corresponded with the large disc herniation at the L/3-4 found on MRI imaging. On examination, Dr. Ignatiadis found decreased motility on straight leg raising, weakness of the quadriceps muscles, and absent left knee reflex.  Dr. Ignatiadis recommended surgical removal of the disc material pressing on the nerve. (*Id*). The surgery was performed, and a postoperative MRI of the lumbar spine was taken on July 2, 1999, which showed some loss of desiccation of the L2-3 through L4-5 disc spaces, mild disc bulging without herniation, but no evidence of disc material pressing on the nerve. (Tr. at 755).

Over the next eight years, Claimant saw Dr. Klinestiver approximately ten times for a variety of minor ailments. (Tr. at 756-58). He did not complain of any further back pain during this period. On October 25, 2007, Claimant presented to Dr. Klinestiver and requested a physical examination for medical coverage. Claimant reported that he had recently been discharged from Charleston Area Medical Center after receiving treatment for a cerebrovascular accident (stroke). (Tr. at 758).  Dr. Klinestiver noted that Claimant was taking several cardiac medications and was trying to quit smoking.

### 2.    *January 2008 through July 30, 2010*

During the relevant time period, Dr. Klinestiver provided treatment to Claimant and collected assorted records reflecting treatment by other health care providers. On February 22, 2008, Claimant presented to CAMC Teays Valley Hospital's Emergency

Department with complaints of diffuse chest pain and numbness and shaking of his left arm. (Tr. at 759). The records provided to Dr. Klinestiver reflected that Claimant had normal cardiac markers, but an EKG showed signs of possible left atrial enlargement. (Tr. at 760). Claimant's pain decreased with nitroglycerin so he was placed on telemetry observation. In view of Claimant's complaints of arm numbness and shaking, an MRI of the brain was performed, which revealed an acute infarction of the right temporal and right occipital lobes, as well as other focal areas of infarction of the right frontal and parietal lobes thought to be the result of an embolic phenomenon. (Tr. at 763). There were no signs of acute hemorrhage, midline shift, or extraaxial fluid collections. (Tr. at 764). A CT scan of the brain taken the next day showed no evidence of an acute intracranial abnormality. (Tr. at 768).

On February 25, 2008, Claimant underwent a carotid artery trend study. (Tr. at 765-66). The study demonstrated no more than a 50% diameter stenosis on the right side and less than 40% on the left side. According to the study's parameters, a 40% stenosis was considered mild, and 50% to 70% stenosis was considered moderate. The vertebral arteries were normal. (*Id.*).

On March 5, 2008, Dr. Klinestiver performed a physical examination of Claimant and completed a form supplied by the West Virginia Department of Health and Human Resources ("WVDHHR") in connection with an application for Medicaid benefits. (Tr. at 769-771). Dr. Klinestiver documented Claimant's statement of incapacity/disability to be atherosclerotic cardiovascular disease ("ASCVD") with myocardial infarction ("MI") and cerebrovascular accident ("CVA") and chronic obstructive pulmonary disease ("COPD"). Claimant's speech, posture, gait, hearing and eyesight were all within normal limits. On physical examination, Claimant had decreased breath sounds, right ankle swelling,

abnormal neurological findings, and arteriosclerosis of the heart, carotids, and brain. Dr. Klinestiver opined that Claimant should avoid all work activities for six months to one year and recommended that he see a cardiologist for evaluation and treatment. (*Id.*).

On April 9, 2008, Claimant presented to the Emergency Department at CAMC Teays Valley Hospital. (Tr. at 781-83). According to the records collected by Dr. Klinestiver, Claimant arrived by ambulance complaining of severe pain in his lower back. He reported feeling fine until three or four days earlier when he heard a "pop" in his back while getting out of a truck. He also indicated that he felt numb from the left knee down.  A lumbar MRI showed narrowing at the L3-4 due to a disc bulge, as well as a left foraminal disc bulge at the L5-S1 causing exit nerve root irritation. (*Id.*). Claimant was given pain medication and a steroid injection and was discharged with instructions to see Dr. Ignatiadis in two to three days. Claimant followed-up with Dr. Klinestiver on May 16, 2008 and reviewed his list of medical problems, which included pain in his left index finger and hip; bulging discs in the lumbosacral spine; osteoarthritis, ASCVD, CVA with left hemiparesis; tobaccoism; and alcoholism, possibly recovering. (Tr. at 790). Dr. Klinestiver ordered an x-ray of Claimant's hip, which was reported as showing only mild degenerative changes.  (Tr. at 794).

Dr. Klinestiver also referred Claimant to Dr. M. Yaser Haffar for a cardiac evaluation in May 2008. As a result of that evaluation, on June 10, 2008, Claimant underwent a left cardiac catheterization, selective coronary angiography, and a left ventriculography. These tests showed mild atherosclerotic plaquing with a 10% stenosis of the mid left anterior descending coronary artery, no other significant stenosis, and a preserved left ventricular systolic function.  (Tr. at 795-96).

On November 6, 2008, Claimant presented to Dr. Klinestiver's office with chills, body aches, rapid heart beat, and lack of appetite. (Tr. at 790). Dr. Klinestiver ordered some laboratory testing and took Claimant off work through November 11, 2008.  By November 8, 2008, Claimant reported that he was doing better and had an increased appetite.  (Tr. at 799).

On January 8, 2009, Claimant complained that he may have broken his foot.  (Tr. at 799). Dr. Klinestiver ordered an x-ray and took Claimant off work until January 12, 2009.  The x-ray revealed no evidence of fracture or foreign body, but did note mild dorsal soft tissue swelling. (Tr. at 800). Approximately one month later, Claimant returned to Dr. Klinestiver's office complaining of a left-sided tremor, (Tr. at 801), and another month later, he complained of low blood pressure and varicose veins.  (*Id.*).

Claimant presented to the Emergency Department at CAMC Teays Valley Hospital on July 9, 2009, on Dr. Klinestiver's instructions, with complaints of generalized weakness, atypical chest pain, and jaundice. (Tr. at 804-06, 813-14). Claimant reported a history of alcohol intake for the past thirty years that had escalated to the point where he drank a fifth of vodka each day and had done so for the prior five years until two weeks earlier when he quit drinking altogether. On physical examination, Claimant was in no acute address. His blood pressure was low, but it improved while he was in the Emergency Department. The remainder of his examination was normal. His laboratory work showed low potassium, an elevated ammonia level and macrocytic anemia. Claimant was admitted to the telemetry unit to monitor him for signs of acute myocardial infarction and for further work-up. (Tr. at 806). His cardiac evaluation was unremarkable and chest and abdominal x-rays were normal. (Tr. at 809-10, 816). A subsequent CT scan of Claimant's abdomen and pelvis

revealed an enlarged liver with probable fatty infiltration, possible underlying alcoholic hepatitis, and diffuse atherosclerotic vascular calcifications. (Tr. at 817-18). An abdominal ultrasound reflected evidence of gallstones and a fatty, enlarged liver. (Tr. at 819)  The presence of gallstones was confirmed by abdominal MRI. (Tr. at 820). In view of his gastrointestinal findings, Claimant was instructed to stop drinking and smoking. (Tr. at 809-10).

On July 13, 2009, Claimant was seen by a surgeon for treatment of his gallstones. (Tr. at 811-12). However, when questioned, Claimant denied symptoms suggestive of biliary colic. The surgeon concluded that Claimant had jaundice secondary to liver failure with probable hepatic necrosis. He recommended consideration of a liver biopsy, but did not suggest gallbladder surgery. A subsequent HIDA scan confirmed the presence of gallstones, but showed no evidence of a common bile duct obstruction.  (Tr. at 821).

In an office record dated August 11, 2009, Dr. Klinestiver noted that Claimant had been an inpatient at CAMC Teays Valley Hospital for gallbladder disease and cirrhosis. (Tr. at 822). Dr. Klinestiver ordered some laboratory studies and decided to refer Claimant for an in-depth evaluation by a gastroenterologist. (Tr. at 822). Dr. Klinestiver checked Claimant again one week later and observed that he had a high glucose level and blurred vision. (Tr. at 822).  Dr. Klinestiver wrote a note on a piece of prescription paper stating that due to "the severity of [Claimant's] medical problems he is unable to engage in gainful employment and this disability is expected to last a period of one year."  (Tr. at 827).

On September 14, 2009, Dr. Klinestiver documented in his office chart that Claimant had seen the gastroenterologist and was found to have acute gout and

cirrhosis. (Tr. at 830). He further noted that Claimant was scheduled to undergo additional testing. On September 29, 2009, Claimant underwent an esophagogastroduodenoscopy ("EGD") with biopsy of the stomach tract performed by Dr. Joe Gerges El-Khoury. (Tr. at 834-36). Based upon this testing, Dr. El-Khoury diagnosed Claimant with hiatal hernia, erosive gastritis, portal hypertensive gastropathy, and duodenitis. Dr. El-Khoury started Claimant on Prilosec, recommended a change of his blood pressure medication, and told him to avoid alcohol. (Tr. at 835). On November 18, 2009, Dr. Klinestiver ordered some follow-up blood work and indicated that Claimant was now taking Nexium. (Tr. at 830).

Claimant provided records from Dr. Klinestiver's office reflecting six additional visits during 2010. (Tr. at 892-99). The records demonstrate that Claimant continued to see Dr. El-Khoury for gastrointestinal issues and also consulted with Dr. Leonard Fichter, a general surgeon, for hard lesions on both feet and "venous insufficiency." Dr. Fichter supplied Dr. Klinestiver with a copy of his office note and the results of arterial and venous studies of Claimant's lower extremities performed on June 8, 2010. (Tr. at 905-06, 893-95). The office record indicated that Claimant complained of knots in the veins of his legs with numbness of the extremities. The symptoms were worse on the left side and seemed to be increasing. A physical examination revealed 1+ pedal pulses bilaterally, mild extremity edema, no cyanosis, and some lower extremity varicosities. Claimant's deep tendon reflexes were present and equal in both upper and lower extremities. (Tr. at 905-06). The arterial study showed evidence of superficial femoral and/or popliteal disease, and the venous study showed reflux throughout the greater saphenous veins bilaterally. Dr. Fichter also sent the results of a CTA of Claimant's abdominal aorta and lower extremities, which revealed possible gallstones; some aortic

atherosclerosis without aneurysm; patent arteries; fat-containing inguinal hernias; and some plaque and stenosis in the arteries of the extremities with patent vessels. (Tr. at 896). On this test result, Dr. Klinestiver wrote "walking time bomb." (*Id.*). Finally, Dr. Klinestiver's records contained assorted laboratory results and a Cardiac Questionnaire that he completed and forwarded to the SSA. (Tr. at 945-951). Except for his own disability evaluations, Dr. Klinestiver did not have access to examinations and evaluations prepared for disability evaluation or to a copy of the disability file.

### B.    Medical Records Not Contained in Dr. Klinestiver's Chart

### 1.    *February 2008 Hospitalization*

On February 22, 2008, Dr. Thomas Rittinger interviewed and examined Claimant while he was hospitalized at CAMC Teays Valley Hospital for chest pain and left arm numbness. (Tr. at 590-91). Claimant reported a past medical history of gout, but indicated that he had never been hospitalized for that condition and took no regular mediations.  He admitted to smoking a pack of cigarettes and drinking a pint of alcohol every day. Dr. Rittinger diagnosed Claimant with a non-ST elevation myocardial infarction; left arm numbness due to transient ischemic attack versus cerebrovascular accident; tachycardia; chronic alcohol abuse; tobacco abuse; and hypokalemia. He placed Claimant on several medications and requested neurology and cardiac consultations.

Both consultations took place the following day. (Tr. at 592-93). Dr. Muhammad S. Nasher-Alncam, a neurologist, noted that Claimant worked as a cook two days per week and was a heavy drinker and smoker. Claimant reported that he had felt tired and was having flu symptoms prior to the onset of chest pain and arm numbness, but had otherwise been in good health. On examination, Dr. Nasher-Alncam found Claimant's

cerebellar function to be abnormal on the left side, and Claimant was unable to do rapid alternative movements well with his left hand although he was left-handed. A bilateral carotid ultrasound revealed plaque in both carotids. (Tr. at 599). Dr. Nasher-Alncam advised Claimant that he needed to take aspirin or Plavix daily for the rest of his life to prevent future strokes and heart attacks. He also advised Claimant that he was at risk for cardiomyopathy secondary to alcoholism.

Dr. Scott Patrick Duffy, a cardiologist, also reviewed Claimant's history and was told that Claimant had a history of gout, but took no medications and had no ongoing medical needs. (Tr. at 596). Dr. Duffy agreed with Dr. Rittinger that Claimant had suffered a non-ST elevation myocardial infarction and recommended that Claimant take Plavix, a beta blocker, statins, aspirin, and heparin. He ordered an echocardiogram, which reflected an abnormal injection fraction of 30%-35%.

Dr. Rittinger subsequently requested a surgical consultation regarding the plaque found in Claimant's carotid arteries. (Tr. at 594). Accordingly, Dr. Leonard Fichter examined Claimant on February 24, 2008. (Tr. at 594-95). Dr. Fichter suspected carotid artery stenosis and ordered a CTA, which revealed mild stenosis.

Dr. Rittinger discharged Claimant from the hospital on February 26, 2008. (Tr. at 586-89). In the discharge summary, Dr. Rittinger diagnosed Claimant with an acute cerebrovascular accident affecting the right temporal, occipital, frontal and parietal lobes; carotid stenosis bilaterally; a non-ST elevation myocardial infarction; cardiomyopathy, ischemic versus alcoholic with reduced injection fraction; B12 deficiency; anemia secondary to B12 deficiency; hypertension; alcohol abuse; and tobacco abuse. Dr. Rittinger documented that Claimant left the hospital early against medical advice after having an argument with his wife. He was given prescriptions and

told to see Dr. Haffar for a follow-up visit. (*Id.*).

## 2.    Outpatient Treatment Related to Stroke and Cardiac Symptoms

Claimant presented to Dr. Haffar for follow-up care on March 14, 2008.  (Tr. at 368).  He told Dr. Haffar that he had not experienced any additional chest pain, but still had some discomfort in his left shoulder and neck and weakness in his left finger and thumb. Dr. Haffar recommended that Claimant have a left heart catheterization, which was scheduled on March 20, but was canceled on the day of the procedure due to Claimant having a fever and an infected finger.  (Tr. at 347).

Dr. Haffar rescheduled Claimant's catheterization after the infection in his finger resolved. (Tr. at 369). The left heart catheterization revealed only mild atherosclerotic disease with no significant stenosis. (Tr. at 370). Dr. Haffar recommended continued medical management and instructed Claimant to stop smoking, increase his exercise and lose weight. He advised Claimant that he could return to work. Dr. Haffar also ordered color duplex ultrasounds of Claimant's carotids, which were performed on June 11, 2008 and showed mild (less than 50%) stenosis of the right internal carotid artery and very mild (less than 30%) stenosis of the left internal carotid artery. (Tr. at 352-53).

On February 19, 2009, as part of an Emergency Department visit, Claimant had a CT scan of his head and brain. (Tr. at 531). At that time, he was complaining of dizziness and tremors bilaterally. The imaging revealed chronic small vessel ischemic changes with no evidence of intracranial hemorrhage or mass effect. An old lacunar infarction and mild encephalomalacic changes in the right occipital lobe were present from the prior stroke, but there were no signs of an acute event.

On March 26, 2009, Claimant returned for a follow-up visit with Dr. Haffar after

having been hospitalized three weeks earlier. (Tr. at 371). Claimant denied having any symptoms, but admitted to continuing his habits of smoking and heavy drinking contrary to Dr. Haffar's advice. Dr. Haffar modified Claimant's medication regimen and again instructed him to stop drinking, or seek help to stop, and return in six months.

Claimant returned one month later due to swelling of both lower extremities and elevated blood pressure. (Tr. at 372). On examination, Dr. Haffar found Claimant's left leg to be swollen primarily around the ankle area. He ordered a lower extremity venous doppler study and increased Claimant's blood pressure medication. The doppler showed no evidence of deep venous thrombosis. (Tr. at 374).

On July 10, 2009, as part of an Emergency Department evaluation, Claimant underwent an echocardiogram that showed preserved left ventricular systolic function with mild to moderate left ventricular hypertrophy and no evidence of valvular disease. (Tr. at 398-99). A nuclear stress test performed the following day was negative, showing a normal hemodynamic response. (Tr. at 400).

### 3.    *March 2009 Hospitalization*

On March 5, 2009, Claimant was taken by ambulance to the Emergency Department of CAMC Teays Valley Hospital with chest tightness and dizziness. (Tr. at 479-80). He had taken 4 nitroglycerin tablets with relief of the chest pain but thereafter became light-headed. Claimant was diagnosed with unstable angina and admitted for additional evaluation and treatment.

The following day, Dr. Haffar examined Claimant. (Tr. at 483-84). According to Dr. Haffar's consultation summary, Claimant had been experiencing dizziness for four weeks and had uncontrolled blood pressure, but had only been receiving emergency care. Claimant admitted that he continued to smoke, and his mother reported that he

drank a lot as well. Dr. Haffar reviewed the cardiac testing ordered through the Emergency Department and ruled out an acute myocardial infarction. He surmised that Claimant's chest pain was probably not cardiogenic and his dizziness was likely a medication side effect. Dr. Haffar expressed concern over Claimant's continued alcohol abuse and recommended counseling. He indicated that Claimant's alcohol intake could be the cause of most of his symptoms. (Tr. at 484).

Claimant was discharged on March 7, 2009 with instructions to follow up with Dr. Klinestiver in one week and Dr. Haffar in four weeks. (Tr. at 474). His discharge diagnoses included atypical chest pain; hypertension; hyperlipidemia; and history of alcohol abuse. Claimant was also told to eat a low cholesterol cardiac diet.

### 4.    May 2009 and June 2009 Hospitalizations

Claimant arrived by ambulance to CAMC Teays Valley Hospital's Emergency Department on May 30, 2009 complaining of chest tightness. (Tr. at 506). He had taken three nitroglycerin tablets and aspirin, so he was pain free upon presentation. He advised the Emergency Department physician that he had been out of several of his medications for an extended period of time. Upon examination and review of laboratory studies and an EKG, the Emergency Department physician found no evidence of an acute cardiac process. (Tr. at 506-07). However, she decided to admit Claimant to the hospital for further work-up by a cardiologist. She also noted that Claimant had an area of redness, warmth, and tenderness to the right calf, which she felt was a cellulitis. (Tr. at 508).

Claimant was admitted to the service of Dr. Michael Robie, who also performed a physical examination of Claimant. (Tr. at 509-10). Dr. Robie documented Claimant's primary complaints as chest pain and hypertension. By way of history, Claimant advised

Dr. Robie that he had suffered a myocardial infarction in the past, but had undergone a stress test the prior October that was negative. He admitted that he continued to smoke and drink regularly. Dr. Robie saw no alarming laboratory results and a chest x-ray was normal. He diagnosed chest pain, hyperlipidemia, and hypertension. Dr. Robie planned to consult with Dr. Haffar about possibly performing another stress test. (*Id.*).

The following day, Dr. Haffar examined Claimant in the hospital. (Tr. at 511-12). Dr. Haffar learned from Claimant that his blood pressure had been well-controlled on metoprolol, but had recently begun to increase and had remained elevated for awhile. On examination, Dr. Haffar noted that Claimant's blood pressure had decreased since his admission from 168/116 to 120/87. He concluded that Claimant's chest pain was likely due to uncontrolled hypertension and felt that some changes to Claimant's medication regimen would solve the problem. Dr. Haffar cleared Claimant for discharge and instructed him to return to the office for follow-up in two to three weeks. (Tr. at 512.)

Ten days later, on June 10, 2009, Claimant returned by ambulance to the CAMC Teays Valley Hospital's Emergency Department complaining of chest pain that subsided with nitroglycerin. (Tr. at 546-48). Claimant advised the Emergency Department physician that he sometimes had difficulty affording his medications. He admitted to smoking and drinking regularly although he claimed to have reduced his alcohol intake to no more than four drinks per day. The Emergency Department physician was skeptical of this report, however, noting that Claimant was tremulous with an elevated MCV and an abnormal liver profile. A chest x-ray was reported as normal and a CT angiography of the pulmonary arteries showed no evidence of pulmonary embolus; calcification in the left anterior descending coronary artery; and an enlarged liver with

fatty infiltration. (Tr. at 549-50). The ED physician suggested that Claimant remain in the hospital for serial troponin levels to make sure that he was not having a heart attack. (Tr. at 548).  However, Claimant chose to return home against medical advice. (*Id.*).

### 5.     *July 2009 Hospitalization*

Claimant was admitted to CAMC Teays Valley Hospital on July 9, 2009 and was discharged on August 7, 2009. Dr. Brad McCoy acted as Claimant's primary treating physician during the admission and prepared a discharge summary outlining Claimant's hospital course. (Tr. at 376-78). The summary indicated that Claimant was admitted with complaints of generalized weakness, jaundice, atypical chest pain and dyspnea (labored breathing) on exertion. Laboratory studies showed a markedly elevated total bilirubin, hypokalemia, and a mildly elevated ammonia level. After cardiology consultation and testing, Claimant was cleared of any cardiac event. Surgical evaluation resulted in a diagnosis of alcoholic hepatitis. Dr. McCoy treated Claimant with prophylactic antibiotics and stabilized his electrolytes. He was given smoking cessation education and offered nicotine patches, but he refused them. In light of Claimant's liver damage, Dr. McCoy instructed Claimant to avoid alcohol and Tylenol. Dr. McCoy explained to Claimant that he would probably need a liver transplant in the future and his prognosis was poor if he continued to drink alcohol. On discharge, Claimant was instructed to contact Dr. Klinestiver for follow-up and for consultation with a gastroenterologist.  (*Id.*).

### 6.     *Gastroenterology Consultation*

On August 25, 2009, Claimant presented to Dr. El-Khoury for management of chronic liver disease. (Tr. at 718-22). Dr. El-Khoury documented that Claimant had a twenty year history of alcohol abuse and for the previous five years had been drinking a

fifth of liquor every day until he stopped drinking three months earlier. Claimant reported feeling fine and eating well. He continued to smoke and no longer exercised. Dr. El-Khoury conducted a review of systems, which elicited complaints of musculoskeletal symptoms and gout of the left foot. (Tr. at 720). However, Dr. El-Khoury specifically noted that there was no weakness or loss of motor strength in Claimant's extremities. A complete physical examination was performed and was normal except for liver enlargement. Dr. El-Khoury diagnosed Claimant with alcoholic cirrhosis and recommended an EGD, abdominal ultrasound, and laboratory studies for further evaluation. He also counseled Claimant on the importance of continuing to abstain from alcohol. (Tr. at 721-22). The ultrasound was performed on September 14, 2009 and showed a fatty liver and small cholesterol polyps versus soft stones in the gallbladder. (Tr. at 714). On October 21, 2009, Dr. El-Khoury's nurse wrote Claimant a letter telling him that the results of his EGD were acceptable, but he would need to schedule another one in one year. (Tr. at 705).

Claimant returned to Dr. El-Khoury's office on October 29, 2009 for routine follow-up. (Tr. at 693-704). Dr. El-Khoury noted that Claimant's recent testing had revealed the presence of erosive gastritis, portal hypertensive gastropathy, and duodenitis for which he was being medically managed. Claimant reported feeling well with no gastrointestinal symptoms. He continued to abstain from alcohol but still smoked. Claimant reported no musculoskeletal symptoms or problems with any other system and his physical examination was entirely normal. His liver was no longer enlarged. Dr. El-Khoury instructed Claimant to return for follow-up in six months, to continue taking his prescription medications, and to avoid alcohol and non-steroidal anti-inflammatory medications due to their impact on his liver. (*Id.*).

Claimant next returned to Dr. El-Khoury's office on June 29, 2010 for his six month check-up. (Tr. at 918-923). Claimant denied any symptoms and stated that he was doing well. He continued to abstain from alcohol consumption and made no complaints on the review of systems. Once again, his physical examination revealed no abnormalities. Dr. El-Khoury ordered standard screening blood work and referred Claimant to an endocrinologist for management of hyperlipidemia. (*Id.*). Claimant saw Dr. Mateen Hotiana, an endocrinologist, on July 8, 2010. (Tr. at 934-37). Dr. Hotiana recorded that Claimant had stopped taking medication for hyperlipidemia approximately one year earlier and his triglycerides had markedly increased. On review of systems, Claimant complained of feeling fatigued and of having some back pain; however, his physical examination was normal. Dr. Hotiana recommended that Claimant take Tricor to reduce his triglycerides and see a dietician for a low fat diet. Dr. Hotiana noted that Claimant's diabetes was well-controlled and his cirrhosis was being managed. (*Id.*).

### C.    Disability Evaluations

On April 22, 2009, Dr. Klinestiver performed a physical examination and completed a disability form at the request of the West Virginia Department of Health and Human Services. (Tr. at 358-60). He indicated that Claimant had decreased breath sounds, alcoholism and tobaccoism. Dr. Klinestiver also observed that Claimant had a swollen left index finger and edema and ecchymosis of the left leg. Dr. Klinestiver opined that Claimant could not work at his customary occupation, but provided no explanation for that opinion. He recommended that Claimant be referred to a cardiologist and neurologist for evaluation and added that Claimant had "multiple CVDs [cerebrovascular accidents] by MRI ... COPD ... Prolapsed intervertebral disc L5." (*Id.*).

On December 28, 2009, Elizabeth Durham, M.A., performed a neuropsychological screening of Claimant at the request of the Disability Determination Section ("DDS"). (Tr. at 734-40). She indicated that Claimant arrived to the evaluation unaccompanied and by car. He used no assistive devices to walk and his posture and gait were normal. Ms. Durham reviewed Claimant's medical history, noting no prior mental health treatment. He admitted his past abuse of alcohol, but stated that he quit drinking in June 2009. Claimant described his vocational history, advising that he had worked as a cook at various restaurants in the area. Ms. Durham conducted a mental status examination, which was entirely normal. She administered the Wechsler Adult Intelligence Test, which showed that Claimant had average intelligence with mild memory impairment. Ms. Durham diagnosed Claimant with depressive disorder, NOS, based on his report of feeling depressed and with cognitive disorder based upon his mild memory impairment. She opined that his social functioning, persistence, and pace were all normal. (*Id.*).

On December 30, 2009, Claimant underwent pulmonary function studies at the request of DDS at Tri-State Occupational Medicine. (Tr. at 741-42).  Based upon the pre-med testing, Claimant was diagnosed with mild chronic obstructive pulmonary disease ("COPD"). The ventilatory report form documented no evidence of acute respiratory illness or bronchospasm. (*Id.*).

On January 1, 2010, Dr. James Binder completed a Psychiatric Review Technique for the SSA after reviewing Claimant's neuropsychological examination and some assorted medical records. (Tr. at 843-856). Dr. Binder opined that Claimant had an organic mental disorder and an affective disorder, but neither impairment was severe. Examining the paragraph B criteria, he opined that Claimant had mild limitations in

activities of daily living, social functioning, and maintaining concentration, persistence and pace. He saw no episodes of decompensation of extended duration. He also saw no evidence of paragraph C criteria. Dr. Binder's conclusions were corroborated by Dr. Karl Hursey, who completed a second Psychiatric Review Technique on February 12, 2010. (Tr. at 867-80).

On January 13, 2010, Dr. James Egnor prepared a Physical Residual Functional Capacity Assessment at the request of the SSA. (Tr. at 858-865). Dr. Egnor noted that Claimant's primary diagnosis was CVA with resolution of weakness; his secondary diagnosis was non-ST myocardial infarction by enzymes; and his other alleged impairments included COPD, hyperlipidemia, hypertension, and diabetes. Dr. Egnor reviewed numerous treatment records and diagnostic studies, as well as the disability chart. He also examined Dr. Klinestiver's statements supplied to the Department of Health and Human Resources. Based upon this information, Dr. Egnor opined that Claimant could occasionally lift and carry 20 pounds; could frequently lift and carry 10 pounds; could stand/walk/sit about 6 hours each in an eight hour workday; and was unlimited in his ability to push and pull. Dr. Egnor felt Claimant was limited to only occasional climbing, balancing, stooping, kneeling, crouching, and crawling, but he had no manipulative, visual, or communicative restrictions. Because of Claimant's history of COPD, myocardial infarction, and stroke, Dr. Egnor stated that Claimant should avoid concentrated exposure to extreme heat and cold, fumes, odors, dusts, gases, and hazards like machinery and heights. Dr. Egnor expressly disagreed with Dr. Klinestiver's assessment that Claimant was unable to work, explaining that the medical records in the file did not support that degree of limitation. In conclusion, Dr. Egnor indicated that Claimant was capable of doing light level work with some postural and environmental

limitations and was not fully credible when describing the extent of his limitations. (*Id.*). In a second Physical Residual Functional Capacity Assessment completed on February 22, 2010, Dr. Rogelio Lim essentially agreed with Dr. Egnor's assessment, with the exception that Dr. Lim felt Claimant should never attempt to climb ladders, ropes, and scaffolds and should avoid concentrated exposure to vibrations. (Tr. at 882-890).

On August 27, 2010, Dr. Klinestiver completed a Cardiac Questionnaire, which was provided to the ALJ after the administrative hearing but before the written decision was issued. (Tr. at 945-950). In the form, Dr. Klinestiver noted that he saw Claimant one to two times per month for chronic illnesses, including cirrhosis, gallbladder disease, COPD, CVA, ASCVD with old myocardial infarction, prolapsed disc, diabetes, hypertension, and gout. He indicated that Claimant was not a malingerer. According to Dr. Klinestiver, Claimant had marked limitation of physical activity and depression. However, he did not feel that Claimant's depression contributed to his functional limitations. Dr. Klinestiver opined that Claimant could walk no more than 1/2 of a city block without resting or having pain; could stand and walk less than an hour in an eight hour work day; could sit between 1 and 2 hours in an eight hour work day; could frequently carry less than 5 pounds, occasionally carry 6-10 pounds, and could never carry more than 10 pounds. Dr. Klinestiver did not complete the remainder of the questionnaire, did not reference specific medical findings to substantiate his assessment of Claimant's physical limitations, and did not provide an opinion regarding whether Claimant met a listed impairment. (*Id.*).

**VII.** <u>**Analysis**</u>

    **A.**    **ALJ's Consideration of the Treating Source Opinion**

Claimant contends that the ALJ violated the Social Security regulations and

rulings by failing to accord controlling weight to the August 2010 opinion of Dr. Klinestiver contained in the Cardiac Questionnaire. In Claimant's view, the ALJ compounded this error by failing to weigh Dr. Klinestiver's opinion using the factors set forth in 20 C.F.R. §§ 404.1527 and 416.927 and by providing only a cursory explanation for his rejection of the opinion. In response, the Commissioner argues that the ALJ was correct in disregarding Dr. Klinestiver's opinion. Using the factors enumerated in the regulations, the Commissioner supplies a variety of reasons supporting the ALJ's refusal to give the opinion controlling weight.

20 C.F.R. §§ 404.1527(c) and 416.927(c) outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *See* 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given **controlling** weight when the opinion is supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.* If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6),[2] and must explain the reasons for the weight given to the opinions. "Adjudicators must remember

---

[2] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected … In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188 *4. Nevertheless, a treating physician's opinion may be rejected in whole or in part when there is persuasive contrary evidence in the record. *Coffman v. Brown,* 829 F.2d 514, 517 (4th Cir. 1987). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

A review of the decision demonstrates that the ALJ did not accord controlling weight to Dr. Klinestiver's August 2010 opinion regarding Claimant's limitations. Instead, the ALJ "rejected" it on the basis that "the doctor's opinion is without substantial support from the other evidence of record. Furthermore, the doctor did not have the benefit of reviewing all of the evidence of record." (Tr. at 27). Claimant is correct that the ALJ did not explicitly discuss how any of the medical source opinions fared under each of the six factors set forth in the regulations, and his explanation of the weight given to each opinion appears somewhat limited.[3] Consequently, there are three queries before the Court. The first question is whether the ALJ complied with the "treating source rule" and applicable regulations when he weighed the medical source

---

[3] In his motion, the Commissioner supplies a detailed analysis of Dr. Klinestiver's opinion under the factors; however, the Court cannot "create post-hoc rationalization" to explain the ALJ's treatment of evidence. *Wilson v. Astrue*, 2010 WL 1534191 *4 (D. Kan. Mar. 31. 2010) (citing *Grogan v. Barnhart,* 399 F.3d 1257, 1263 (10th Cir.2005)). Instead, the Court must affirm or reverse the decision in light of the explanation provided by the ALJ. *Patterson v. Bowen*, 839 F.2d 221, 225 n. 1 (4th Cir. 1988).

opinions and ultimately discounted Dr. Klinestiver's conclusions. Second, the Court must examine whether the ALJ's articulation of the reasons for the weight given to the medical source opinions was adequate. The final, related question is whether the ALJ's decision to disregard Dr. Klinestiver's opinion is supported by substantial evidence.

In the Cardiac Questionnaire, Dr. Klinestiver opined that Claimant could lift no more than 10 pounds; could walk no more than ½ of a city block before resting or having pain; could not stand or walk more than 1 hour during an eight hour workday; and could sit no more than 1 to 2 hours. (Tr. at 947). Although he does not specifically identify medical documentation that supports these extreme functional limitations, Dr. Klinestiver refers to the EGD result, the July 2009 hospitalization, and the consultations of Claimant's gastroenterologist, endocrinologist and surgeon. As previously stated, a treating physician's opinion is not entitled to controlling weight unless it is supported by laboratory or diagnostic studies and is not inconsistent with other substantial evidence. It may be entirely disregarded in the face of persuasive contrary evidence.

Here, the ALJ engaged in a lengthy and detailed discussion of the medical evidence and testimony before assigning weight to the medical source opinions. (Tr. at 22-26). First, he discussed Claimant's stroke, pointing out that Claimant's hospitalization was not lengthy. After the stroke, Claimant showed only minor limitations that did not require physical therapy. His left-sided weakness had largely resolved by May 28, 2009 according to a treatment note prepared by Cardiovascular Consultants. Moreover, treatment records reflected no disruption in Claimant's ability to walk or speak. (Tr. at 23). In regard to Claimant's cardiac condition, the ALJ referred to diagnostic tests, which showed that Claimant's coronary artery stenosis was mild, only 10%, and his left ventricular systolic function was preserved. A Doppler ultrasound

of Claimant's carotid arteries also showed only mild stenosis. After a thorough evaluation conducted during the March 2009 hospitalization, Claimant's atypical chest pain was determined not to be cardiac in origin. Claimant had negative serial enzymes and a negative EKG, with no difficulties related to ambulation, self-care, or routine activities. (Tr. at 24). On June 10, 2009, Claimant had another negative EKG, and an echocardiogram and stress test performed on July 12, 2009 were likewise negative. Claimant received only conservative treatment and never underwent cardiac stenting or cardiac rehabilitation. The ALJ commented that Claimant continued to smoke, which further indicated that his heart condition was not disabling. (Id.).

The ALJ next reviewed the records pertaining to Claimant's hypertension, observing that when Claimant was compliant with his medication regimen, he was asymptomatic. When examining Claimant's musculoskeletal complaints, the ALJ recognized the MRI results showing bulging discs, but indicated that Claimant was not referred for surgery and did not receive physical therapy or regular steroidal injections. In addition, Claimant did not receive ongoing specialty care; rather, he was given only conservative treatment. Similarly, Claimant received minimal treatment for alleged gouty arthritis; the ALJ emphasized that no objective medical evidence actually established the diagnosis.

The ALJ addressed Claimant's cirrhosis and COPD. He acknowledged that Claimant was hospitalized in July 2009 for an enlarged liver with fatty changes. However, upon receiving treatment, Claimant's symptoms resolved. Office notes written by Dr. El-Khoury in August and October 2009 reflected significant improvement in Claimant's condition. In an October 29, 2009 notation, Dr. El-Khoury wrote that Claimant reported feeling fine, had no evidence of jaundice, and had a normal liver and

spleen on palpation. These findings were repeated on June 29, 2010, with Claimant confirming that he was doing well and his examination netting normal findings. The ALJ observed that while talk of a liver transplant had occurred, nothing in the records suggested that Claimant had been placed on a transplant list. Similarly, Claimant's COPD was determined to be only mild when tested on December 30, 2009. (Tr. at 25). Claimant had not been hospitalized for COPD, did not see a specialist, and did not receive breathing treatments. Overall, the ALJ remarked on the conservative nature of Claimant's treatment, stating that if the impairments were truly as disabling as Claimant described, more intensive treatment would have been ordered.

Based upon this review of the evidence, the undersigned finds that the ALJ acted appropriately in refusing to accord controlling weight to the August 2010 opinion of Dr. Klinestiver. Dr. Klinestiver failed to identify any objective diagnostic or clinical findings to corroborate the severity of the functional limitations that he imposed on Claimant. In fact, it is impossible to discern how Dr. Klinestiver arrived at his opinions because the medical records simply do not contain notations upon which such findings could rest and Dr. Klinestiver's own written notes are wholly lacking in meaningful details. (*See* Tr. at 744, 746, 748, 756, 758, 799, 801, 822, 830, 892, 899). Moreover, the meticulous analysis of Claimant's treatment records performed by the ALJ highlights the inconsistency of Dr. Klinestiver's opinion when compared to the statements and observations of the other treating physicians.

Having concluded that the ALJ complied with the applicable regulations in his refusal to allot controlling weight to Dr. Klinestiver's opinion, the Court next examines whether the ALJ properly weighed all of the medical opinions and adequately articulated his reasons for the weight allocated to them. As Claimant aptly points out,

the ALJ did not supply details in the written decision regarding how he applied the factors in 20 C.F.R. §§ 404.1527(c), 416.927(c) to determine the weight given to the opinions. Nonetheless, the Court does not find the absence of specifics regarding each factor to constitute error requiring a remand of the Commissioner's decision. Although 20 C.F.R. §§ 404.1527(c), 416.927(c) provide that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. Social Security Ruling 96-2p provides additional clarification of the ALJ's responsibility to give good reasons, stating:

> When the determination or decision: is not fully favorable, e.g., is a denial ... the notice of determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

Cases discussing this duty take different approaches on what and how much the ALJ must include in the written opinion to constitute an adequate explanation. Some courts require the ALJ to "comprehensively set forth reasons for the weight assigned to a treating physician's opinion." *Newbury v. Astrue,* 321 Fed. App'x 16, 17 (2nd Cir. 2000) (quoting *Halloran v. Barnhart,* 362 F.3d 28, 33 (2nd Cir. 2004)); *see also Sharfez v. Bowen,* 825 F.2d 278, 279 (11th Cir. 1987). Other courts only insist on a detailed analysis of the weight given to a treating physician's opinion under the factors when there is an absence of "reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist." *Rollins v. Astrue,* 464 Fed. App'x. 353,

358 (5th Cir. 2012) (*per curiam*) (quoting *Newton v. Apfel,* 209 F.3d 448, 453 (5th Cir. 2000). Finally, some courts take the position that while the ALJ must consider the factors; he is not required to discuss each one in his opinion as long as a subsequent reviewer is able to understand the weight given to the opinions and the reasons for that weight. *Oldham v. Astrue,* 509 F.3d 1254, 1258 (10th Cir. 2007); *see also Green v. Asrue,* 558 F. Supp.2d 147, 155 (D. Mass. 2008). Simply stated, the adequacy of the written discussion is measured by its clarity to subsequent reviewers. The undersigned finds this view most harmonious with the language and intent of the regulations and rulings.

In this case, the ALJ began his discussion of Claimant's RFC assessment by verifying that he had considered the opinion evidence in accordance with 20 C.F.R. §§ 404.1527, 416.927, SSR 96-5p, and SSR 96-2p. The ALJ then launched into a review of Claimant's allegations of disability, as well as the specific objective medical findings and clinical notations that the ALJ believed were most revealing of Claimant's impairments and their functional impact. Immediately after this discussion, the ALJ addressed the medical source opinions on Claimant's limitations, indicating which he felt were consistent with and supported by the evidence and which were not. It is sufficiently clear to the undersigned by its context that when the ALJ found Dr. Klinestiver's opinion to be without support from the other evidence of record, the ALJ was referring to the evidence he had just reviewed in detail. It is equally clear that when the ALJ noted that Dr. Klinestiver "did not have the benefit of reviewing all of the evidence of record," the ALJ was comparing Dr. Klinestiver to the non-examining consultants whose opinions the ALJ was also weighing. The consultants' opinions verify that they had the benefit of reviewing Dr. Klinestiver's medical file, as well as the disability file, which contained

additional evidence, such as the office records of Dr. El-Khoury, various hospital records not provided to Dr. Klinestiver, the Adult Function and Disability Reports, and the Reports of Contact, none of which were available to Dr. Klinestiver when he completed the Cardiac Questionnaire. (Tr. at 864-65, 889-90). Moreover, the Court can infer from the explanation provided by the ALJ that he used the appropriate factors in weighing the opinions. The ALJ recognized that Dr. Klinestiver was Claimant's treating physician, while noting that Dr. Egnor, Dr. Lim, and Dr. Hursey were "reviewing" consultants. The ALJ obviously examined the consistency and supportability of the various opinions as demonstrated by his review of the evidence. Finally, given that one of the "other factors" identified in 20 C.F.R. §§ 404.1527(c)(6), 416.927(c)(6) is "the extent to which an acceptable medical source is familiar with the other information in [the] case record," the ALJ's observation that Dr. Klinestiver did not have access to all of the evidence of record shows that the ALJ considered the "other factors" in weighing the opinions. Thus, the Court finds that the ALJ complied with the governing mandates in his consideration of the opinions and provided an explanation that was sufficiently specific to allow the Court to understand the weight he gave to each medical source opinion and the underlying reasons for his allocation.

Lastly, the Court finds that the ALJ's decision to disregard Dr. Klinestiver's opinion was supported by substantial evidence. Although Dr. Klinestiver had a long-term treatment relationship with Claimant, his treatment was limited to run-of-the-mill problems, like colds and muscles spasms. Dr. Klinestiver usually referred Claimant to specialists for the diagnosis and management of more complex conditions and much of the ALJ's discussion involved the records generated by these consultants. The hospital records in evidence further confirmed that Dr. Klinestiver did not care for Claimant

during his hospitalizations; instead, Claimant's care was managed by hospitalists, internists, and the other consulting specialists. Dr. Klinestiver's qualifications, which were collected by the ALJ and placed in the Transcript of Proceedings, demonstrate that he was a sole practitioner, maintained a general family practice, was not board-certified in any medical specialty, and did not have active admitting privileges at any of the hospitals frequented by Claimant. (Tr. at 951). When examining the medical chart submitted by Dr. Klinestiver, it is clear that he did not have access to some of the records considered most relevant by the ALJ; in particular, the office records of Dr. El-Khoury and various records from Claimant's hospitalizations. For example, in a hospital consultation report dated March 6, 2009, which was not contained in Dr. Klinestiver's record, Claimant's treating cardiologist expressed his suspicion that alcohol abuse might be responsible for most of Claimant's current symptoms, which included atypical chest pain, dizziness, liver enzyme abnormalities, uncontrolled hypertension, and tremors. (Tr. at 484). Eventually, Claimant decided to quit drinking and gradually his overall health began to improve. Dr. El-Khoury's office records reflect this improvement. Only a month before Dr. Klinestiver completed the Cardiac Questionnaire, Dr. El-Khoury prepared a comprehensive note documenting an office visit with Claimant. (Tr. at 918-929). In the note, Dr. El-Khoury wrote that Claimant "states he is doing well." He denied having any abdominal symptoms and admitted to having a good appetite. He had gained 8 pounds since his last visit in October 2009. Dr. El-Khoury conducted a review of systems, which elicited no systemic complaints, as well as no complaints involving the head, neck, eyes, ears, nose, throat, cardiovascular, pulmonary, gastrointestinal, endocrine, hematological, musculoskeletal, neurological, or psychological systems. (Tr. at 921-22). Claimant's physical examination revealed no abnormalities; even his liver,

spleen, and gallbladder were normal to palpation.

A review of the treatment records confirms that Claimant had only minimal residual limitations from his stroke. He had no evidence of progressive or debilitating cardiac disease; to the contrary, his invasive cardiac testing revealed only minor stenosis. In 2008 and 2009, Claimant was hospitalized on several occasions for atypical chest pain, uncontrolled hypertension, and gastrointestinal complaints. However, these admissions were thought to have resulted from medical complications triggered by Claimant's excessive drinking. Pulmonary function studies reflected only mild COPD despite Claimant's persistent smoking. Claimant had findings of bulging discs on MRI but denied any musculoskeletal symptoms when asked by Dr. El-Khoury and did not seek specialized care for back pain. Diagnostic testing showed no evidence of deep vein thrombosis or poor venous blood flow. (Tr. at 374). Overall, the treatment notes indicate that when Claimant was compliant with recommended medication and diet regimens, his chronic conditions were well-controlled. Consequently, for all of these reasons, the Court finds the ALJ's treatment of Dr. Klinestiver's opinion was compliant with the applicable regulations and rulings and was supported by substantial evidence.

### B.    Impairments in Combination

Claimant next complains that the ALJ failed to consider his impairments in combination. In Claimant's view, the ALJ only superficially considered the cumulative effect of Claimant's combined impairments when reviewing the Listing and never considered the combined impact of his impairments thereafter.

The written decision unequivocally refutes Claimant's contention. First, the ALJ performed an exhaustive examination of the listed impairments most relevant to the totality of Claimant's symptoms. The ALJ thoroughly explained the reasons why

Claimant failed to meet listings involving the musculoskeletal, respiratory, cardiovascular, neurological, immunological, digestive, and hematological systems, comparing the severity criteria contained in the Listings with the medical findings associated with Claimant's combined impairments. "For a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria." *Sullivan v. Zebley,* 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). Similarly, "[f]or a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment ... A claimant cannot qualify for benefits under the 'equivalency' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Id.* at 531. While the ALJ addressed each section of the Listings separately, he considered the entirety of Claimant's symptoms and medical findings in determining equality or equivalence to the individual listings.

The ALJ also took into account the combined effect of Claimant's impairments when crafting Claimant's RFC. He explained that Claimant's left-sided weakness, atypical chest pain, mild breathing problems and occasional gouty arthritis limited him to light level exertional work. These conditions, when combined with Claimant's liver disease and anemia, resulted in additional non-exertional limitations. Claimant was required to avoid a number of environmental irritants, such as extreme temperatures, fumes, odors, vibrations, humidity, and was prohibited from driving a motor vehicle in a work setting. In light of Claimant's problems with grip strength and coordination, his occasional limp, and his exertional chest pain, the ALJ restricted Claimant from

engaging in frequent bending, stooping crawling, kneeling, and crouching, and from any climbing on ladders, ropes, or scaffolds. (Tr. at 21-22). Claimant argues that the ALJ failed to consider the effect of Claimant's physical limitations on his emotional stability and also failed to account for the side effects of his medication. However, no treating or examining physician indicated that Claimant's non-severe psychological impairments were worsening or that his psychological conditions resulted in additional functional limitations. To the contrary, Dr. Klinestiver expressly denied any functional consequence, indicating that Claimant was depressed because of his physical symptoms, but the depression did not contribute to the severity of Claimant's subjective symptoms or his functional limitations. (Tr. at 946). As far as the side effects of Claimant's medications, the ALJ expressly noted that no medical records substantiated Claimant's testimony that his medications caused him to be lightheaded and nauseous on a persistent basis. (Tr. at 26). Having considered and accounted for Claimant's functional limitations arising from his combined impairments, the ALJ relied upon the testimony of a vocational expert to determine disability.  The vocational expert, being fully aware of the various factors that reduced Claimant's ability to perform work-related activities, opined that Claimant was still able to perform jobs that were available in significant numbers in the national and regional economies. (Tr. at 61-66). Therefore, the Court finds that the ALJ properly considered Claimant's combined impairments and their effect on his ability to work and reached a decision that is supported by substantial evidence.

## VIII.  <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment

Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  September 27, 2012.

Cheryl A. Eifert
United States Magistrate Judge